UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
EMILY MARIE ODERMATT,

                              Plaintiff,

              -against-

AMY WAY, *et al.*,

                              Defendants.
------------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 2 5 2016 ★

BROOKLYN OFFICE

**MEMORANDUM AND ORDER**

13-CV-5017 (SLT) (ST)

**TOWNES, United States District Judge:**

Plaintiff Emily Marie Odermatt ("Plaintiff"), who was removed from a fellowship program operated by the NYC Teaching Fellows ("NYCTF") less than two months after being accepted, brings this *pro se* action pursuant to 42 U.S.C. §§ 1983 and 1985(3), principally alleging First Amendment retaliation in connection with unspecified posts to closed Facebook groups established by the NYCTF to promote communication between Fellows. Amy Way and Izaak Orlansky (collectively, "Defendants"), the only two defendants remaining in this action, now move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), alleging that Plaintiff's fourth amended complaint (the "Complaint") fails to state a claim on which relief may be granted. For the reasons set forth below, Defendants' motion is granted with respect to all federal claims and Plaintiff is denied leave to replead. The Court declines to exercise supplemental jurisdiction with respect to Plaintiff's state-law claims.

## BACKGROUND

Unless otherwise indicated, the following facts are drawn from the Complaint and the exhibits thereto. For purposes of this Memorandum and Order, the allegations in the Complaint

are assumed to be true and the exhibits that describe the NYCTF and the Fellows program are assumed to be accurate.

NYCTF is a partnership between the New York City Department of Education ("DOE") and TNTP, a national nonprofit organization. Complaint, ¶ III.A.1 & Ex. X, p. 2. It offers fellowships as part of an effort "to recruit and prepare high quality, dedicated individuals to become teachers who can raise student achievement in the New York City classrooms that need them most." *Id.*, Ex. V, p. 1. In the "Fellows program," these individuals—or "Fellows"— "train to teach a specific subject area" by working in New York City public schools during the day and pursuing a Master's degree at night. *Id.*

According to NYCTF documents attached to the Complaint, the Fellows program begins with "a short, but intensive, pre-service training," for which each Fellow receives a small stipend. *Id.*, Ex. H.[1] This seven-week training program includes some coursework, but also encompasses fieldwork in a New York City summer school classroom and Fellow Advisory sessions in which "Fellows ... spend time with an Advisor and other Teaching Fellows focusing on the practical skills necessary to become effective beginning teachers." *Id.*, Ex. V, p. 1. To remain in the Fellows program, a Fellow must "maintain good standing" as "a participant in pre-service training, through successful completion and professional conduct, as determined by the NYC[TF]...." *Id.*, Ex. Q, p. 1. According to the 2013 Pre-Service Training Handbook, excerpts of which are attached to the Complaint as Exhibit X, the Fellows are employees of the DOE and

---

[1]For the pre-service training which took place in the summer of 2013, all Fellows received $2,500, while those participating in the Science or Math immersion programs received an additional stipend of $1,000. Complaint, Ex. H.

can "be dismissed from the program at any time for any reason not prohibited by statute." *Id.*, Ex. X, p. 2.

In addition to satisfactory completion of pre-service training, Fellows must pass the Liberal Arts and Sciences Test ("LAST") and a Content Specialty Test ("CST") in order to be eligible to teach in New York City public schools. *Id.*, Ex. G. Fellows are not guaranteed a teaching job, but are expected to conduct an "independent job search," utilizing resources, tools and support services provided by NYCTF. *Id.*, Ex. I. If a Fellow is not hired as a full-time teacher by the start of the school year, the Fellow is permitted to continue with the subsidized coursework until the end of the year, but is required to participate in "an extended pre-service training program through the fall that includes coursework and student teaching." *Id.* However, to continue in the Fellows program, a Fellow must secure "a full-time, school budgeted position" by early January. *Id.*

When a Fellow begins the full-time teaching position, he or she receives a first-year teacher's salary. *Id.*, Ex. U, p. 1. "Fellows are eligible to teach full-time under the NY State Transitional B certificate while working toward a Master's degree at one of the NYC Teaching Fellows program's partner universities." *Id.*, Ex. V, p. 1. The DOE "subsidizes most of the costs of tuition for the master's program," but "each Fellow is responsible for some portion of the master's degree tuition ...." *Id.* In 2013, Fellows were expected to contribute $7,500 toward the cost of their graduate education. *Id.*, Ex. H. To remain in the Fellows program, a Fellow must "maintain good standing" as "a student, as determined by the institution of higher learning" in which the Fellow is enrolled. *Id.*, Ex. Q, p. 1.

*The Facts Alleged in the Complaint*

The Complaint itself contains the following allegations, all of which are assumed to be true for the purposes of this Memorandum and Order. On April 24, 2013, Plaintiff received an email from NYCTF stating that she had been accepted into the June 2013 Fellows program to train to teach Biology Immersion. *Id.*, ¶ III.C & Ex. C. Plaintiff accepted the offer on April 25, 2013. *Id.*, ¶ III.D.

During the period between that date and early June 2013, Plaintiff worked on a number of tasks that were either required of, or optional for, Fellows in her subject area. *Id.*, ¶ III.E. These tasks included completing an online application for admission to the Relay Graduate School of Education ("Relay"), the academic institution to which Plaintiff was assigned for her graduate studies. *Id.*, ¶ III.E.7. In addition, Plaintiff applied for full-time teaching positions at New York City public schools. *Id.*, ¶ III.F. Three schools expressed interest in interviewing Plaintiff and Plaintiff interviewed with two of the three. *Id.*, ¶ III.F-H.

On June 4, 2013, Plaintiff began an 8-day Biology Immersion Course at Relay as part of her pre-service training. *Id.*, ¶ III.L. On June 13, 2013, Plaintiff received a voicemail from Julie Fry, a NYCTF Administrator. *Id.*, ¶ III.L.2. Plaintiff returned the call and had a telephone conversation with Fry. *Id.* The Complaint characterizes the conversation as "about [Plaintiff's] speech about the program and the causation between determination that a Fellow lacks professionalism and failure at the end of the summer phases of the program." *Id.*

At the time of this conversation, Plaintiff had not yet completed her application for the Master's program at Relay because she had yet to graduate from college. *Id.*, ¶ III.V.4(b). Plaintiff "had not yet received any word as to whether and in what way [she] would be accepted

to the Relay ... program." *Id.*, ¶ III.V.4(d).  Plaintiff also had not signed or uploaded the "Fellow

Commitment Form." *Id.*, ¶ III.X.  That form, which had to be completed as part of the

enrollment process, required Plaintiff to certify, *inter alia*, that she understood that she had to

remain in "good standing" as (1) "a participant in pre-service training, through successful

completion and professional conduct, as determined by the NYC Teaching Fellows program" and

(2) "a student, as determined by the institution of higher education" in which she was enrolled in

order to remain in the Fellows program. *Id.*, Ex. Q, p. 1.

On the afternoon of Tuesday, June 18, 2013, defendant Amy Way, the Executive Director

for Teacher Recruitment and Quality, emailed Plaintiff a letter informing her that she was "no

longer eligible to remain a ... Fellow as a result of [her] failure to meet the requirements of the

Fellows program." *Id.*, ¶ III.O & Ex. D.  Way quoted to those portions of the Fellow

Commitment Form that required that a Fellow to remain in good standing as a participant on pre-

service training and as a student, then stated: "You have failed to meet these requirements

because you are no longer in good standing with Relay ...." *Id.*, Ex. D.   Way concluded that

because Plaintiff had failed to meet the requirements of the Fellows program, she was "being

removed from the Fellowship effective immediately ...." *Id.*

On June 26, 2013, Plaintiff had a conversation with Izaak Orlansky, a Special Assistant to

defendant Way, relating to her termination. *Id.*, ¶ I.B.5 & Ex. E.  Although Orlansky is named as

a defendant in this action, apparently on the basis of this conversation, the Complaint does not

contain specific allegations regarding what Plaintiff and Orlansky discussed.

*Additional Facts Gleaned from the Exhibits to the Complaint*

Although the Complaint provides no detail concerning the events which immediately preceded Plaintiff's June 13, 2013, conversation with Fry, some details can be gleaned from the voluminous exhibits attached to the pleading. These exhibits include approximately 800 pages of posts that Plaintiff and other Fellows made to Facebook groups set up by the NYCTF. Most of these posts deal with mundane topics and need not be fully described here.

For purposes of this Memorandum and Order, it is sufficient to note that some of Plaintiff's posts reflected her dissatisfaction with being forced to attend Relay for her graduate studies. That dissatisfaction was apparent from an emoticon in a post Plaintiff sent on the afternoon of May 10, 2013, shortly after learning that she and most other biology Fellows had been assigned to Relay. It read: "Relay, as well. :-/." *Id.*, Ex. Y, p. 655. Over the next few hours, Plaintiff and other Fellows shared articles and information they had discovered concerning Relay. Plaintiff posted an article critical of Relay with the heading: "To all those who are in Relay: Read this article and begin to get worried." *Id.*, Ex. J, p. 9.

On May 12, 2013, Plaintiff emailed a set of detailed questions to representatives of both NYCTF and Relay. These inquiries were primarily addressed to Relay and questioned, among other things, whether Relay, as a "very new" institution, would offer support services typical of a "traditional campus," such as work-study jobs or career counseling. *Id.*, Ex. Z, pp. 3-4, ¶¶ 3, 13. In an email dated May 17, 2013, Alison Brusch, a Program Associate at NYCTF, responded to those questions, answering some and referring Plaintiff to Kelly Boucher, who worked at Relay's Office of Enrollment Services, for the answer to others. *Id.*, pp. 8-12. Plaintiff was apparently

unconvinced of the merits of a Relay education, as reflected by posts dated June 1, 2013, in which she made it clear that she was anxious to transfer to Pace University. *Id.*, Ex. J, pp. 4-7.

Around 7:30 p.m. on June 12, 2013, just after a Middle Schools Teacher Recruitment Fair, a Fellow named Lichelle Itouta posted a question to one of the Facebook groups, asking for "Job fair reflections." *Id.*, Ex. Y, p. 17. Unaware that the "administrator of the group approved, monitored, and/or censored comments published therein," *id.*, ¶ III.R, Plaintiff offered the following assessment:

> You didn't miss anything. It was over-crowded, too superficial, and there was a mass of biology people. All it did was re-confirm my interest in teaching high school. A lot of pseudo-charters.

*Id.*

A few minutes later, Itouta wrote that she had met some current Relay students at the job fair. *Id.*, Ex. Y, p. 19. Plaintiff responded, "Lemme guess, they are in LOVE with the program?" *Id.*, p. 20 (emphasis in original). When Itouta replied, "they really are," *id.*, Plaintiff inquired: "So they had nothing bad to say? Nothing? Not ONE THING?" *Id.*, p. 22 (emphasis in original). When Itouta responded in the negative, Plaintiff opined, "that seems cult-like." *Id.*

A little over an hour later, a Fellow named Rahul Patel commented on Plaintiff's prior posts, writing:

> Emily you have just been fairly pessimistic bout [*sic*] relay. How much do you really know about relay? Your [*sic*] getting a masters degree at a fraction of the cost. Your [*sic*] learning how to be an effective teacher. It honestly feels like u want to go to a school that has "prestige".

*Id.*, p. 24. In response, Plaintiff acknowledged that it might "seem ungrateful to not celebrate the opportunity without the critical eye," but made it clear that she did not view Relay as a

prestigious school. *Id.*, p. 30. Plaintiff first defined prestige as "the self-pride as a school/ university/college to want to do best by your students," and opined that prestige could be "measured in transparency, efficiency, preparednesss, pride based on one's own work ...." *Id.* She then claimed that Relay "admitted to falling short on all of these areas," stating:

> For example, the fact that Relay won't be giving us any plan of study until after the date by which we have to sign the commitment form. That is like asking a stock purchaser to pick a stock without seeing a business plan or stock value history. It is an investment in our time, our $7500, our résumé space, and our effort (in all of their classes). To me that is also sacrificing some other things, which I won't reiterate. The harm: preparedness. How can we model effective teaching if their model is be prepared "later?" Do you think an EFFECTIVE teacher gives a syllabus halfway through a class? No. Don't model poor preparedness if you don't expect it of your students.

*Id.*, p. 31 (emphasis in original). Later, Plaintiff questioned the value of a Relay degree, writing:

> The issue remains as to whether the DOE principals will hire me, and continue to hire me, with Relay on my résumé. That's another thing a prestigious school has that Relay does not; alumni who have jobs based on their education at other NYC schools. As far as I'm concerned, Relay has no evidence that supports any success which can be correlated to their strategies as a school. I asked them, multiple times, whether or not in PUBLIC SCHOOLS they had data which supported the fact that their methodology made for successful teacher/peer/principal evaluations. They had nothing.

*Id.*, p. 32-33 (emphasis in original).

The online discussion regarding Relay continued until well after midnight, with one member of the Facebook group defending Relay as "extremely successful so far," *id.*, p. 36; another sympathizing with Plaintiff but noting that NYCTF did not allow Fellows to chose "their assigned universities," *id.*, p. 35; and yet another reminding Plaintiff that she could simply quit if she was "that upset with the fellowship." *Id.*, p. 36. With respect to the latter comment, Plaintiff

8

responded, "I am aware that I am an at-will fellow, so to speak." *Id.*, p. 36. She showed no

interest in quitting, however, ending the discussion by complaining: "I STILL have not gotten an

answer as to why I cannot earn federal work-study money at Relay, since they are a federal

financial aid supporting institution!" *Id.*, p. 42 (emphasis in original).

Around 6:00 the next morning, Melissa Anne Stephanie, a woman who had interviewed

Plaintiff at the job fair the previous evening, posted a message on the Facebook forum, telling

Plaintiff that she was "saddened to hear your negativity about the program and Relay." *Id.*, p. 47.

Stephanie wrote that "the comment on pseudo-charter hit close to home" and that it had hurt her

feelings "to ... see someone I thought was great last night in a different way." *Id.*

Plaintiff was not at all apologetic when she responded to Stephanie's post at around 10:30

a.m. on June 13, 2013. Plaintiff wrote that she did not mind that Stephanie saw her differently by

virtue of having read her Facebook posts, but found her comments helpful in deciding where to

work. She explained:

> I come from a political perspective developing from the
> technically-advantaged, whereby social media is the new frontier
> for freedom of speech and concerted activity. From the perspective
> of an employer, it may be that concerted and free expression is not
> desirable; however, it is helpful to me to know in advance whether
> the climate created by that employer is repressive or discouraging
> with regard to employees who believe in forums of social network-
> facilitated activity; this is one factor about a school which could
> influence my opinion about a job or an interview, so thank you for
> sharing your views.

*Id.*, p. 48.

Later on June 13, 2013, Fry called Plaintiff. Although the Complaint offered only a

cursory description of what Fry said, Exhibit Z to the Complaint includes an email in which

Plaintiff described the conversation in more detail. According to that email, Fry informed Plaintiff that someone at Relay had expressed concern about "the magnitude and tone" of Plaintiff's Facebook posts. *Id.*, Ex. Z, p. 15. Fry "repeat[ed] twice that [Plaintiff's] behavior had the potential to put [Plaintiff's] graduate degree at ... Relay ... in jeopardy because it would impact [Plaintiff's] 'good standing' at their school ...." *Id.* Fry opined that Plaintiff "would not pass the ... pre-service training" if Plaintiff continued to express herself over social media. *Id.*, p. 14.

On Sunday, June 16, 2013, Plaintiff emailed NYCTF a six-page letter, asking to address with Fry's supervisor certain "grievances" arising from the June 13 conversation. *Id.* Plaintiff stated that she found Fry's "tone to be abrasive, rude, and insulting," and that she was "not prepared to tolerate her method of coercion by ultimatum or her degradation, the likes of which were exemplified when [she] passed along the comments made by others ...." *Id.* Plaintiff characterized her posts as "use of Facebook to provide relevant, specific and factual, even if negative, information about our mutual program" and a "concerted effort to inform and engage my fellow Fellows." *Id.*, p. 15. Plaintiff found Fry's comments "deeply concerning" because she was "well aware that [her] rights include the right to express [her]self over social media." *Id.*

Plaintiff then proceeded to denigrate Relay, noting that it was not a university but "a new program within a school that is making up our curriculum as we enter." *Id.* She noted that because Relay insisted that Fellows attend classes on Saturdays, she could not continue to volunteer as a debate coach—the activity which had inspired her to teach in the first place. *Id.*, pp. 16-17. In addition, Plaintiff complained that Relay was unwilling to accept credits that she had earned at CUNY's Department of Nursing, *id.*, pp. 17-18, and was "not able to support

positions in Queens," the borough in which Plaintiff had resided her entire life and hope to work.

*Id.*, p. 18. Plaintiff closed by stating:

> For these reasons, I would like the New York City Teaching
> Fellows to redress my grievances. Specifically, I would accept
> being given the opportunity to transfer from the Relay Graduate
> School of Education MAT program to the Pace University MAT
> program **immediately**, beginning with the summer semester, so
> that I could continue my journey with the New York City Teaching
> Fellows towards an academically and geographically more ideal
> education and teacher role. I understand that this is not a normal
> route of the 2013 Biology Immersion Fellows, but I think that
> extenuating circumstances are the reason why my alternate
> proposal should be accepted.

*Id.*, p. 19 (emphasis in original).

Although Plaintiff had completed the 8-day Biology Immersion Course at the time she

sent this email, Relay considered Plaintiff to be "a non-matriculated (rather than degree-seeking

and credit-earning) student" pending receipt of her "degree conferred transcript." *Id.*, Ex. T, p. 2.

According to an email from Relay GSE enrollment dated June 6, 2013, Relay could nonetheless

"consider [Plaintiff] for admissions" upon receipt of a "signed letter on letterhead from

[Plaintiff's undergraduate] institution's registrar's office indicating [her] expected date of

graduation." *Id.* (Emphasis omitted). That letter had been sent to Relay on June 6, 2013, but

Plaintiff had yet to be notified as to whether she would be accepted as a Master's degree

candidate. *Id.*, ¶ III.V.4(d).

On June 18, 2013—less than 48 hours after Plaintiff sent her six-page email—Plaintiff

received Way's email stating that Plaintiff was being removed because she was no longer in

"good standing" as a student, as determined by Relay. *Id.*, Ex. D. On June 24, 2013, Plaintiff

spoke by phone with Kelly Boucher, an employee at Relay's Office of Enrollment Services. *Id.*,

¶ III.T.  According to an email attached to the Complaint as Exhibit F, Plaintiff asked if she could re-enroll in Relay if she were reinstated to the Fellows program.  *Id.*, Ex. F.  After checking with the registrar, Boucher emailed Plaintiff to say that it was too late to be admitted to the Class of 2015, but that she could apply next Spring for the Class of 2016.  *Id.*  However, Boucher also noted: "Given your removal from the Fellows program, you are not eligible to enroll as a degree-seeking student."  *Id.*  Boucher offered Plaintiff admission as a non-degree student, however, for the purpose of generating a transcript showing the credits she earned in Biology Immersion.  *Id.*

On June 26, 2013, Plaintiff had a conversation with defendant Izaak Orlansky, a Special Assistant to defendant Way.  Neither the Complaint nor the exhibits thereto describe this conversation, aside from an exhibit which indicates that Plaintiff posed questions relating to her removal from the Program.  *Id.*, Ex. E.  On July 2, 2013, Way sent Plaintiff an email which purported to "follow up" on the conversation with Orlansky.  *Id.*  In that email, Way again stated that Plaintiff had been removed because she "did not meet the admissions requirements of ... Relay" and, therefore, had not remained in good standing as a student.  *Id.*  Way further explained that Relay was "the only institution of higher education available to [Plaintiff] as a certification provider for the 2013 Fellows program" because other institutions, including Pace University, did "not support Fellows participating in Immersion programs."  *Id.*  Way concluded that Plaintiff was "not eligible to receive biology certification through any other institution that is working with the NYC Teaching Fellows 2013 program," but noted that Plaintiff was "welcome to pursue certification through other pathways."  *Id.*

*This Action*

On September 9, 2013, Plaintiff commenced this action by filing a complaint against the DOE. The Court reviewed the pleading pursuant to 28 U.S.C. § 1915(e)(2)(B) and concluded that it failed to state a claim against the DOE. However, in a memorandum and order dated October 10, 2013 (hereafter, the "First M&O"), the Court explained that Plaintiff might have a First Amendment retaliation claim against Way and other individuals, provided that the Facebook posts which allegedly resulted in her termination constituted speech on a matter of public concern. The Court granted Plaintiff leave to amend her pleading.

On October 21, 2013, Plaintiff filed an amended complaint, naming as defendants Way, Orlansky, Fry and Shauna Hart—a NYCTF administrator who had telephoned Plaintiff on June 18, 2013, to tell her that she was being terminated. That pleading alleged, *inter alia*, that Hart said Plaintiff was being terminated because Plaintiff's Facebook posts evidenced a lack of "professionalism," but did not specifically identify the posts at issue. In an order dated October 24, 2013, Magistrate Judge Lois Bloom directed the United States Marshals Service to serve the amended complaint upon the defendants.

After process was served upon the four defendants, the Court received two pre-motion conference requests: one from the New York City Law Department, which represented Way and Orlansky (ECF Document # 10), and one from a law firm representing Hart and Fry (ECF Document # 21). In those pre-motion conference requests, the defendants sought permission to move to dismiss the amended complaint on the ground that Plaintiff failed to describe the content of the posts which were the subject of her First Amendment retaliation claim. In addition,

13

defendants Hart and Fry moved to dismiss the § 1983 claims against them on the ground that they were not state actors.

In her response to the New York City Law Department's letter, plaintiff noted that she had about 800 pages of the Facebook posts at issue. *See* Letter to Judge Townes from Emily Odermatt, dated Dec. 20, 2013 (ECF Document # 20), at 1. Plaintiff declined to characterize the subject of the posts, stating that "each conversation or group of conversations has its own, individual connection to a matter of public concern." *Id.* She implied that defendant Fry specifically linked her Facebook posts and her termination in their conversation on June 13, 2013, and stated that she "documented this conversation in a contemporary e-mail" which she would be "happy to provide." *Id.*

Plaintiff also stated that she "partially disagree[d] with the framework relied upon by defendant's Counsel," since "treating [her] case like a public employment case assumes several things . . . that can[not] be assumed." *Id.* at 2. Comparing herself to a "student whose tuition was being paid" at the time she was terminated, Plaintiff alleged that the "public employee speech" line of cases was inapplicable. *Id.* at 3. Rather, Plaintiff compared her case to *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995), a case involving "student speech." *Id.*

On March 14, 2014, the Court conducted the pre-motion conference requested by the defendants. During that conference, Plaintiff again implied that there was a question as to whether she was an employee or a student at the time of her termination by citing to Fourth Circuit jurisprudence relating to students. In addition, Plaintiff asserted that she could not be more specific as to which of her Facebook posts led to her termination, since Fry stated only that

14

some of the posts were "negative." Plaintiff implied that at least some of the posts related to issues of public concern, but did not represent that those were the "negative" posts.

In a memorandum and order dated March 17, 2014 (hereafter, the "Second M&O"), the Court directed Plaintiff to file a second amended complaint on or before May 2, 2014, and denied defendants' requests to move to dismiss the amended complaint as moot. The Court provided some guidance regarding how to draft the second amended complaint, stating:

> if plaintiff is uncertain whether she was a student or an employee at the time of her termination from the TFP, she can plead alternate theories of liability: one theory alleging that she was a student and one theory alleging that she was an employee. In addition, plaintiff is advised that plaintiffs can make allegations on information and belief. For example, if plaintiff has reason to believe that her termination was related to communication(s) on ... matters of public concern, she can identify the specific communication(s) and allege on information and belief that the communication(s) prompted her termination.

Second M&O (ECF Document # 27), p. 5.

On March 26, 2014, Plaintiff filed a second amended complaint. Less than a month later, the City Law Department filed another pre-motion conference request, noting that this pleading still did not "identify the actual content of the statements that [Plaintiff] believes to be protected ...." Letter to Hon. Sandra L. Townes from ACC Lawrence Profeta dated April 15, 2014 (ECF Document # 29), p. 2. Asserting that the second amended complaint left it to "the Court to divine from the more than 800 pages of Facebook posts and e-mails included as attachments what statements she might be referring to," *id.*, the City requested permission to move to dismiss on the ground that the pleading did not allege enough facts about the content of the speech at issue for the Court to conclude that the speech was protected by the First Amendment. *Id.*, p. 3.

In addition, the City noted that Plaintiff was not a student of any of the named defendants. *Id.*, p. 2.

Before the Court acted on the City Law Department's pre-motion conference request, Plaintiff moved for permission to amend her complaint yet again and for mediation. ECF Document # 34 & 36. The defendants did not oppose that motion. By order dated September 10, 2014, the Court grant Plaintiff leave to amend her complaint for a third time if mediation proved unsuccessful (ECF Document # 42). In November 2014, after mediation proved unsuccessful, Plaintiff filed her third amended complaint, which Plaintiff incorrectly captioned the "Fourth Amended Complaint" and which is referred to herein as the "Complaint."

### The Complaint

The Complaint does not contain a definitive list of defendants. The caption states that the action is brought against "Amy Way, *et al.*" Paragraph I.B, headed "Defendants," contains six paragraphs which mention Amy Way, Izaak Orlansky and the NYCTF. It is clear that Plaintiff intends to sue Way and, based on her prior pleadings, likely that she still intends to sue Orlansky. However, it is unclear whether Plaintiff intends to sue the NYCTF, which has not been named as a party in any of the prior pleadings.[2]

The Complaint appears to allege five causes of action, the first two of which allege violations of Plaintiff's First Amendment rights. The first cause of action alleges that Plaintiff was "a student participating in an academic program" who was excluded from an extracurricular student group because of the viewpoint she expressed. Complaint, ¶ TT.1. Although the first

---

[2]Hart and Fry, who were named as defendants in previous pleadings, were dismissed from this action by a Stipulation of Dismissal dated December 12, 2014. ECF Document # 55.

cause of action does not mention a particular defendant, Plaintiff alleges, elsewhere in the Complaint, that NYCTF "was an academic program," *id.*, ¶ FF; that the Facebook groups to which Plaintiff belonged were "extracurricular activities to the [NYCTF] program," *id.*, ¶ II; and that the Facebook groups were "limited public fora," as that term is defined in Second Circuit jurisprudence, *id.*, ¶ TT.1(a)1. This cause of action implies that Plaintiff was removed from the Facebook groups because she expressed a "viewpoint," but does not identify that viewpoint or characterize the speech that resulted in her exclusion.

The second cause of action also alleges a violation of the First Amendment, but alleges that Plaintiff was either a student, an applicant for employment, or an employee of the DOE. In setting forth this cause of action, Plaintiff does not identify or characterize the speech involved. In addition, the Complaint does not allege facts to establish a connection between the speech and Plaintiff's removal from the Fellows program.

The third cause of action alleges a violation of New York Labor Law § 201-d(2)(c). This provision makes it "unlawful for any employer or employment agency to refuse to hire, employ or license, or to discharge from employment or otherwise discriminate against an individual in compensation, promotion or terms, conditions or privileges of employment because of ... an individual's legal recreational activities outside work hours, off of the employer's premises and without use of the employer's equipment or other property." Plaintiff maintains that her participation in the Facebook groups was part of her hobby of "social media participation." *Id.*, ¶ TT.5(a). Plaintiff asserts that she was at least an applicant for employment, if not an employee of the DOE, and asserts that "it may be unlawful for them to use [her] Facebook activities as a reason" for either removing her from the Program for failing to hire her. *Id.*, ¶ TT.5©.

17

Plaintiff's fourth cause of action alleges violations of the equal protection and due process clauses of the Fourteenth Amendment. With respect to equal protection, the Complaint alleges that Plaintiff has been treated differently from other "Biology Immersion Fellows whose extracurricular participation was not used as a basis" for adverse action, and that "some views were being discouraged or silenced while other views were permissible, treated indifferently, and/or permitted to continue." *Id.*, ¶¶ TT.5(c) & 6(a). However, the Complaint does not contain any factual allegations regarding the nature, or even the subject, of the views that Plaintiff and the other Fellows expressed.

With respect to due process, Plaintiff cites to *Barnes v. Zaccari*, 669 F.3d 1295 (11th Cir. 2012), for the proposition that a "mutually explicit understanding" can create a property interest. Plaintiff alleges that there was a "mutually explicit understanding" that a Fellow's "Essential Professional Trait[s]," including "professionalism," would only be evaluated at the midpoint and end of the Fellows program, and that Way acted prematurely. Plaintiff alleges that she was entitled to a "Performance Improvement Plan" or at least a "conference" with a NYCTF staff member, at which she could present her "side of the story." *Id.*, ¶ TT.6(b)(2).

Plaintiff's fifth cause of action alleges a conspiracy to infringe her First Amendment rights in violation of 42 U.S.C. § 1985(3). The Complaint does not identify the members of the conspiracy or allege specific facts giving rise to the claim that a conspiracy existed.

***The Instant Motion to Dismiss***

The Memorandum of Law in Support of Defendants' Motion to Dismiss ("Defendants' Memo") contains three points. In Point I, Defendants move to dismiss each of the Complaint's causes of action for failure to state a claim. First, Defendants argue that the Complaint fails to

state a claim for First Amendment retaliation or for violations of New York Labor Law because it does not identify the purportedly protected speech or plead facts plausibly alleging that the protected speech caused Plaintiff's removal from the Fellows program. Second, Defendants argue that Plaintiff's equal protection argument fails because it is based on the same allegations as Plaintiff's First Amendment claims. Third, Defendants move to dismiss Plaintiff's due process claim on the ground that Plaintiff, as an at-will employee, did not have a Constitutionally protected interest in her Fellowship. Fourth, Defendants argue that Plaintiff's § 1985 claim fails because Plaintiff does not allege a conspiracy and because Defendants did not deprive Plaintiff of a right or privilege.

In Point II, Defendants argue that Plaintiff's state-law claims against Way should be dismissed for failure to file a notice of claim. Defendants claim that New York Education Law § 3813 requires Plaintiff to specifically allege that a notice of claim was filed with, and rejected by, the DOE in order to bring state-law claims against the DOE or its officers. Defendants cite to two cases from this district which dismissed Labor Law § 201-d claims on this basis, and assert that this Court does not have the power to extend Plaintiff's time to file the notice of claim.

In Point III, Defendants argue that they are entitled to qualified immunity. Specifically, Defendants assert that their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

## DISCUSSION

### I. Legal Standard

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *See Rothstein v. UBS AG*, 708 F.3d 82, 90 (2d Cir. 2013). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). If a party has not "nudged [her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.*

"[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). A court must "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 878, 790 (2d Cir. 1994)). If a liberal reading of the complaint "gives any indication that a valid claim might be stated," the court must grant leave to amend the complaint. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999).

When considering a Rule 12(b)(6) motion, materials outside the pleadings are "generally not considered ... unless the court treats [the motion] as one for summary judgment, giving all the parties a reasonable opportunity to present relevant evidence under Rule 56." *Nicholls v. Brookdale Univ. Hosp. Med. Ctr.*, No. 03-CV-6233 (JBW), 2004 WL 1533831, at *2 (E.D.N.Y. July 9, 2004). Aside from the allegations in the complaint, which are assumed to be true, a court can consider only "documents attached to the complaint as an exhibit or incorporated in it by reference, ... matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). If matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment and all parties must be given a reasonable opportunity to present material pertinent to the motion. Fed. R. Civ. P. 12(d).

## II. Viewpoint Discrimination

In the first of four arguments contained in Point I of Defendants' Memo, Defendants seek to dismiss the Complaint's first two causes of action, arguing that the Complaint fails to state a claim for First Amendment retaliation. With respect to the first cause of action, Defendants principally argue that Plaintiff has not pleaded facts to suggest viewpoint discrimination. With respect to the second cause of action, Defendants argue that the Complaint fails to state a claim for retaliation relating to Plaintiff's exercise of her free-speech rights under the federal and state constitutions.

With respect to the first of these arguments, the facts alleged in the Complaint not only fail to make out viewpoint discrimination, but are inconsistent with the theory advanced in the

Complaint's first cause of action. This cause of action alleges that Plaintiff was a student and, as such, an "appropriate member of an extracurricular student group"—namely, the three closed Facebook groups set up by NYCTF. Complaint, ¶ IIII.TT.1(a). It characterizes the Facebook groups as "limited public fora," with membership "limited to the 'incoming 2013 Fellows,'" and alleges that Plaintiff had "legitimate membership in the group so long as [she] was enrolled in the ... Fellows program." *Id.*, ¶ III.TT.1(a)(3). The Complaint implies that she was excluded from the forum due to "viewpoint discrimination," citing to various cases for the proposition that the First Amendment prohibits such discrimination even in limited public fora. *Id.*, ¶ IIII.TT.1(a).

The Complaint, however, does not identify any instances in which Plaintiff was prevented from expressing a particular viewpoint during the period in which she was eligible to participate in the Facebook groups. Rather, it alleges that Plaintiff first became unable to access the Facebook groups within approximately 24 hours after she was removed from the program, making her ineligible for membership in those groups. *See id.*, ¶ III.P. Accordingly, the facts alleged by Plaintiff do not support her theory of viewpoint discrimination.

### III. First Amendment Retaliation

Read liberally, the Complaint's second cause of action pleads in the alternative three First Amendment retaliation claims: one premised on the theory that Plaintiff is a student (Complaint, ¶ II.TT.1(d)), another based on the theory that Plaintiff was an applicant for employment (*id.*, ¶ II.TT.1(d)(3)), and a third premised on the view that Plaintiff was an employee of the DOE (*id.*, ¶

II.TT.1(d)(4)).[3] Defendants argue that the Complaint fails to state a claim under any of these three theories.

Preliminarily, the Court notes that facts set forth elsewhere in the Complaint and in the exhibits thereto do not support the theory that Plaintiff was an applicant for employment, rather than an employee. At the time she was removed from the Fellows program, Plaintiff had already begun pre-service training. The Pre-Service Training Handbook expressly provides that Fellows are employed by the DOE. *Id.*, Ex. X, p. 2. However, the fact that Plaintiff was a DOE employee does not foreclose the possibility that she was simultaneously a student. As Judge Amon noted in an unrelated case brought by another Fellow, "the fact that an individual has an employment relationship with an institution does not mean that the individual cannot also be considered a student ...." *Rosenberg v. City of New York*, No. 09-CV-4016 (CBA)(LB), 2011 WL 4592803, at *6 (E.D.N.Y. Sept. 30, 2011).

The Second Circuit has described the elements of a First Amendment retaliation claim in several ways, depending on the factual context. *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir. 2011) (citing *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008)). Generally, "[t]o establish a prima facie case of First Amendment retaliation, a plaintiff must establish '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse

---

[3]The Complaint also seeks to raise parallel constitutional claims under article I, section 8, of the New York State Constitution. *See* Complaint, ¶ III.TT.1(b). Although "[f]ree speech claims under the First Amendment and the New York State Constitution are subject to the same standards," *Brinn v. Syosset Pub. Library*, 61 F. Supp. 3d 247, 255 n. 3 (E.D.N.Y. 2014), *aff'd*, 624 F. App'x 47 (2d Cir. 2015), the following discussion addresses only the First Amendment retaliation claims.

action.'" *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) (citing *Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002)). "As a general rule, student speech in school is protected under the First Amendment unless it would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.'" *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969)) (internal quotation marks in *Tinker* omitted). With respect to employees, "speech enjoys a protected status under the First Amendment if it may 'be fairly characterized as constituting speech on a matter of public concern.'" *Fillie- Faboe v. Vocational Educ. & Extension Bd.*, No. 95-CV-4887 (NGG)(WDW), 2001 WL 533739, at *6 (E.D.N.Y. May 11, 2001) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983), and *Morris v. Landau*, 196 F.3d 102, 110 (2d Cir. 1999)). Accordingly, public employees must establish that "(1) they engaged in constitutionally protected speech because they spoke as citizens on a matter of public concern; (2) they suffered an adverse employment action; and (3) the speech was a motivating factor in the adverse employment decision." *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006) (internal quotation marks and citation omitted)).

"Speech touches upon a matter of public concern when it can 'fairly be considered as relating to any matter of political, social or other concern to the community.'" *Morgan v. City of Milford*, 914 F. Supp. 21, 23 (D. Conn. 1996) (quoting *Connick*, 461 U.S. at 146). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. "Speech that, although touching on a topic of general importance, primarily concerns an issue that is personal in nature and generally related to the speaker's own situation, such as his or

her assignments, promotion, or salary, does not address matters of public concern." *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (brackets and citations omitted).

"[I]n order to survive a motion to dismiss a complaint, a plaintiff asserting First Amendment retaliation claims must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)). Defendants argue that the Complaint (1) does not even identify the speech at issue, much less allege that the speech was Constitutionally protected, and (2) does not allege that Defendants were even aware of the speech, much less motivated by it.

The Court agrees that the pleading is deficient in both respects. First, the Complaint contains only one factual allegation touching on Plaintiff's speech. Paragraph III.L(2) states that sometime during the Biology Immersion Program which took place from June 4 to June 14, 2013, Plaintiff had a telephone conversation with a NYCTF program administrator "about [Plaintiff's] speech about the program and the causation between determination that a Fellow lacks professionalism and failure at the end of the summer phases of the program." That paragraph cites to "Attachment P" to the Complaint, but this exhibit consists of a page from a telephone bill which establishes, at most, that the telephone conversation took place. Nothing in Paragraph III.L(2) or Exhibit P to the Complaint suggests that Plaintiff's speech was Constitutionally protected.

Second, while the Complaint both describes and attaches a copy of the June 18, 2013, email in which Way informed Plaintiff that she was being removed from the Fellows program, neither that email nor any other facts alleged in the Complaint suggest that Way's action was related to Plaintiff's speech. Way's email does not even mention Plaintiff's speech. Rather, it states that Plaintiff failed to meet the requirements of the Fellows program because she was not in "good standing" with Relay. Complaint, ¶ III.O & Ex. D. Although the facts alleged in Plaintiff's six-page email of June 16, 2013, *id.*, Ex. Z, pp. 14-19, might permit the inference that Plaintiff's speech prompted someone at Relay to deny Plaintiff admission, they do not permit the inference that Way was aware of, or motivated by, Plaintiff's speech about the Program.

### *IV. Equal Protection*

The second argument contained in Point I of Defendants' Memo seeks to dismiss Plaintiff's Equal Protection claim on the ground that it coalesces with the First Amendment claims. Defendants note that the Equal Protection claim is based on alleged First Amendment violations and argue that the Equal Protection claims fail for the same reason as the First Amendment claims.

"Where, as here, an equal protection claim is based on an alleged First Amendment violation, the former 'coalesces with the latter.'" *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 372 (S.D.N.Y. 2011) (quoting *Kempkes v. Downey*, No. 07-CV-1298 (KMK)(GAY), 2008 WL 852765, at *6 (S.D.N.Y. Mar. 31, 2008)). In such cases, "the equal protection claim is dependent on the First Amendment claim." *Id.* Thus, "where the First Amendment claim has failed, the equal protection claim fails, too." *Gentile v. Nulty*, 769 F. Supp. 2d 573, 582-83 (S.D.N.Y. 2011) (quoting *Kempkes*, 2008 WL 852765, at *6).

In this case, Plaintiff's equal protection claim is essentially premised on allegations of viewpoint discrimination. The Complaint alleges that "some views were being discouraged or silenced while other views were permissible, treated indifferently, and/or permitted to continue." Complaint, ¶ III.TT.6(a). However, as noted on pp. 22, *ante*, the Complaint does not identify any instances in which Plaintiff was prevented from expressing a particular viewpoint. Indeed, the pleading does not contain any factual allegations regarding the nature, or even the subject, of the views which Plaintiff and the other Fellows expressed. These conclusory allegations are insufficient to state an equal protection claim.

## V. Procedural Due Process

The third argument contained in Point I of Defendants' Memo seeks to dismiss Plaintiff's due process claims on the ground that Plaintiff lacked a Constitutionally protected interest in her relationship with Defendants. "In evaluating due process claims, '[t]he threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Perry v. McDonald*, 280 F.3d 159, 173 (2d Cir. 2001) (quoting *Narumanchi v. Board of Trs. of the Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988)) (brackets added by *Perry*). "If a protected interest is identified, a court must then consider whether the government deprived the plaintiff of that interest without due process." *Narumanchi*, 850 F.2d at 72.

"Property interests ... are not created by the Constitution [but] ... by existing rules or understandings that stem from an independent source ...." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). That independent source can be a statute, *see Goss v. Lopez*, 419 U.S. 565, 572 (1975); an express or implied contract, *see Perry v. Sindermann*, 408 U.S. 593, 601-02 (1972); or rules or mutually explicit understandings. *Id.* at 602-03. "The hallmark

of property ... is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982).

Plaintiff's Complaint implies that she had a property interest in her position because there were "mutually explicit understanding[s]" relating to "disciplinary measures built into and articulated by" the Fellows program. Complaint, ¶ III.TT.6(b) (parentheses omitted). However, the Complaint does not allege facts suggesting that a "mutually explicit understanding" giving rise to a property interest existed. Rather, Plaintiff points to evidence relating to the criteria upon which her performance in the program was to be evaluated and the times during pre-service training in which the evaluations were to be rendered.

In fact, the exhibits attached to the Complaint contain evidence that both NYCTF and Plaintiff understood that Plaintiff could be removed from the Fellows program for any reason not prohibited by statute. Indeed, the NYCTF's Pre-Service Training Handbook expressly advised the Fellows that they could "be dismissed from the program at any time for any reason not prohibited by statute." Complaint, Ex. X, p. 2. Plaintiff acknowledged this in one of her June 12, 2013, Facebook posts, writing: "I am aware that I am an at-will fellow ...." *Id.*, Ex. Y, p. 36. Accordingly, to the extent that there was a mutually explicit understanding between the parties, the understanding was that Plaintiff could be removed without cause. There are no allegations suggesting that Plaintiff had a property interest in her fellowship that would give rise to a due process claim.

## VI. The § 1985 Claim

The fourth argument contained in Point I of Defendants' Memo seeks to dismiss Plaintiff's § 1985(3) claim. "To state a cause of action under § 1985(3), a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (citing *Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 586-87 (2d Cir. 1988)). In addition, "the conspiracy must ... be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (quoting *United Bhd. of Carpenters & Joiners, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 829 (1983)).

In this case, Defendants argue that Plaintiff has not stated a claim under § 1985(3) because, among other things, the Complaint does not allege the existence of a conspiracy. "Complaints that 'contain[ ] only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed ...." *Little v. City of New York*, 487 F. Supp. 2d 426, 441 (S.D.N.Y. 2007) (quoting *Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002)) (brackets added in *Little*). As Defendants note, the Complaint "does not even conclusorily allege the existence of a conspiracy." Defendants' Memo, p. 19. Moreover, the Complaint also fails to specify who

conspired, the goals of the conspiracy, or when the conspiracy took place. Accordingly, the Complaint fails to state a claim under 42 U.S.C. § 1985(3).

## VII. Leave to Replead

In light of Plaintiff's *pro se* status, the Court has carefully considered the issue of whether to permit Plaintiff to replead her federal claims. It is well established that a court should not dismiss a case brought by a *pro se* plaintiff "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez*, 171 F.3d at 795-96 (quoting *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)). However, where the problem with a plaintiff's causes of action is substantive, better pleading will not cure it. *See Cuoco*, 222 F.3d at 112. In such instances, repleading would be futile and "a futile request to replead should be denied." *Id.* (citing *Hunt v. Alliance N. Am. Gov't Income Trust*, 159 F.3d 723, 728 (2d Cir. 1998)).

In this case, some of Plaintiff's causes of action have substantive problems that repleading could not cure. First, Plaintiff's due process claim appears untenable in light of Plaintiff's acknowledgment that she was an at-will employee. Second, Plaintiff's § 1985(3) claim fails because there is no evidence of a conspiracy, much less one motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus." *See Mian*, 7 F.3d at 1088.

The First Amendment retaliation claims, in contrast, were dismissed because of deficiencies in the pleading. Accordingly, the Court has engaged in a review of the exhibits to Plaintiff's Complaint in an effort to ascertain whether those deficiencies are attributable to inadequate or inartful pleading or to substantive problems. For the reasons set forth below, the

Court concludes that there are substantive problems and that granting Plaintiff yet another opportunity to replead would be futile.

First, the Court finds nothing to suggest that Way's decision to remove Plaintiff from the Fellows program was motivated by Plaintiff's speech. Way's June 18, 2013, email to Plaintiff stated that Plaintiff was being removed because she was "no longer in good standing with Relay ..." Complaint, Ex. D. In her June 2, 2013, email to Plaintiff, Way explained:

> [T]he Fellow Commitment Form states that you must maintain good standing 'as a student, as determined by the institution of higher education in which [you are] enrolled. ... [Y]ou were removed from the NYC Teaching Fellows program because you did not meet the admissions requirements of ... Relay .... As a Biology Immersion Fellow, the only institution of higher education available to you as a certification provider for the 2013 Fellows program was Relay ....

*Id.*, Ex. E.

Way's claim that Plaintiff was denied admission by Relay is supported by other evidence attached to the Complaint. In posts written on the evening of June 12, 2013, Plaintiff denigrated Relay as "cult-like," made it clear that she did not view Relay as a prestigious school, and questioned the value of a Relay degree. *Id.*, pp. 22-30. Less than 24 hours later, Plaintiff was informed by Fry that someone at Relay had expressed concern about "the magnitude and tone" of Plaintiff's Facebook posts. *Id.*, Ex. Z, p. 15. Indeed, Fry expressly warned Plaintiff that her behavior had the potential to jeopardize her "good standing" at Relay. *Id.* Plaintiff responded by sending an email which further denigrated Relay and demanded a transfer to Pace University. *Id.*, pp. 14-19. Plaintiff was removed from the Fellows program less than 48 hours after sending this email. In light of these facts, Way's explanation seems highly plausible.

Instead of alleging facts to support the inference that Way dismissed Plaintiff because of her protected speech, the Complaint sets forth Plaintiff's reasons for believing that Way's explanation was fabricated. These reasons are either inconsistent with, or not supported by, the facts set forth in the exhibits to the Complaint. First, the pleading asserts that Plaintiff could not have been rejected by Relay because her application was incomplete without an undergraduate degree-conferred transcript. Complaint, ¶¶ III.LL & III.OO. An email from Relay GSE enrollment dated June 6, 2013, however, informed Plaintiff that Relay required only a "signed letter on letterhead from your institution's registrar's office indicating your expected date of graduation" "in order to consider you for admissions." Complaint, Ex. T. According to documents included in Exhibit T to the Complaint, the registrar's letter was emailed to Relay's Enrollment Office on June 6, 2013.

Second, the Complaint suggests that Boucher's July 25, 2013, email implies that Relay refused to admit Plaintiff because she had been removed from the Fellows program. Complaint, ¶ III.MM. To be sure, Boucher's email states: "Given your removal from the Fellows program, you are not eligible to enroll as a degree-seeking student." *Id.*, Ex. E. However, that statement was offered as an explanation of why Plaintiff could not enroll as a degree-seeking student after her removal from the Fellows program, not as an explanation of why Plaintiff was removed from the Fellows program in the first place.

Third, Plaintiff notes that she never received a letter from Relay informing her that she was not admitted to their school. *Id.*, ¶ III.NN. However, Plaintiff did receive notice that she had not been admitted from Way, the Executive Director of Teacher Recruitment and Quality at

NYCTF, Relay's partner institution and the entity which admitted Plaintiff to the Fellows program in the first place.

Finally, even assuming that Plaintiff had good reasons to believe that Way's explanation for her removal was untrue, Plaintiff still could not allege facts suggesting that her removal was prompted by protected speech. The Complaint reasons that the determination that Plaintiff behaved unprofessionally must have been based on her Facebook posts because "there was an insignificant quantity and/or quality of opportunities to observe [her] conduct in person" and, therefore, that "people evaluating Fellows ... could not have observed unprofessional conduct that could support ... removal." *Id.*, ¶ III.PP. Yet, the Complaint fails to even mention the June 16, 2013, email in which Plaintiff complained about Fry's attitude towards her and made it clear that she was unwilling to accept placement at Relay. That email—which is not Constitutionally protected speech in that it related solely to Plaintiff's own situation and not an issue of public concern—preceded Plaintiff's removal from the Program by less than 48 hours. One can infer that this email, not the Facebook posts, caused Plaintiff's removal from the Fellows program.

For these reasons, the Court concludes that it would futile to grant Plaintiff leave to amend her Complaint yet again. The Court has already afforded Plaintiff three opportunities to do so, and has authored two opinions providing guidance with respect to her First Amendment retaliation claim. In the first of those opinions, the Court advised Plaintiff that her original complaint appeared to raise a § 1983 claim against Way for First Amendment retaliation. The Court advised Plaintiff of the elements of such a claim, specifically advising Plaintiff that public employees enjoyed First Amendment protection only when speaking as a citizen on matters of public concern. The Court cautioned Plaintiff to "carefully assesses whether the Facebook posts

33

which allegedly resulted in her termination constituted speech on a matter of public concern" before filing an amended complaint. First M&O, p. 7.

After Plaintiff filed her First Amended Complaint, Defendants sought permission to move to dismiss the amended complaint on the ground that Plaintiff failed to describe the content of the posts which were the subject of her First Amendment retaliation claim. In her response, Plaintiff noted that she had about 800 pages of the Facebook posts at issue, but implied that she could not characterize the subject of the posts by suggesting that "each conversation or group of conversations has its own, individual connection to a matter of public concern." Letter to Judge Townes from Emily Marie Odermatt dated Dec. 20, 2013 (ECF Document # 20), p. 1. However, Plaintiff implied that Fry referred to certain Facebook posts in their conversation on June 13, 2013, and stated that her conversation with Fry was "documented ... in a contemporary e-mail" which she would be "happy to provide." Id.

At a pre-motion conference on March 14, 2014, the Court directed Plaintiff to amend her complaint to specify the speech which allegedly gave rise to the retaliation. In a Memorandum and Order dated March 17, 2014, the Court tacitly acknowledged that Plaintiff might not know exactly what speech caused her removal from the program, but could make such allegation on information and belief. The Court stated: "[I]f plaintiff has reason to believe that her termination was related to communication(s) on ... matters of public concern, she can identify the specific communication(s) and allege on information and belief that the communication(s) prompted her termination." Second M&O at 5.

Notwithstanding this advice, Plaintiff's two subsequent pleadings have failed to identify any protected speech or to allege that such speech resulted in Plaintiff's removal from the

Fellows program. Indeed, the Complaint contains only a very vague description of Plaintiff's June 13, 2013, conversation with Fry and omits any mention whatsoever of Plaintiff's June 16, 2013, email castigating Fry and demanding an immediate release from the requirement that she complete her application to, and attend, Relay. Given this track record, the Court has no reason to expect that Plaintiff will be able to plead a viable First Amendment retaliation claim if afforded yet another opportunity to do so.

## VIII. *Plaintiff's State-Law Claims*

A district court "may decline to exercise supplemental jurisdiction over a claim ... [if] ... the district court has dismissed all claims over which it has original jurisdiction ..." 28 U.S.C. § 1367(c)(3). Although "[t]he exercise of supplemental jurisdiction is within the sound discretion of the district court," *Lundy v. Catholic Health Sys. of Long Isl. Inc.*, 711 F.3d 106, 117 (2d Cir. 2013), the Second Circuit has repeatedly stated that "if a plaintiff's federal claims are dismissed before trial, 'the state claims should be dismissed as well.'" *Brzak v. United Nations*, 597 F.3d 107, 113-14 (2d Cir. 2010) (quoting *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008)). This rule is consonant with the Supreme Court's observation that when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988).

For the reasons set forth above, Plaintiff's federal claims have all been dismissed for failure to state a claim and the Court has denied leave to replead. Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining State-law claims: namely, the

claim that Defendants violated Plaintiff's rights under Article I, section 8, of the New York State Constitution and the claim that Defendants violated New York Labor Law § 201-d. *See Brzak*, 597 F.3d at 113-14. In light of this decision, the Court need not adjudicate those portion of Defendants' motion which seeks to dismiss these two State-law claims.

## *CONCLUSION*

For the reasons set forth above, Defendant's motion to dismiss Plaintiff's fourth amended complaint is granted with respect to all federal claims. Since Plaintiff has proven unable to state a claim for relief on three prior attempts, despite two opinions providing guidance with respect to her First Amendment retaliation claim, the Court declines to grant Plaintiff leave to amend her pleadings. The Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims and, therefore, does not address Defendants' arguments for dismissing these claims. The Clerk of Court is directed to enter judgment in favor of Defendants with respect to the federal claims and to close this case.

**SO ORDERED.**

/s/ *Sandra L. Townes*
_____
SANDRA L. TOWNES
United States District Judge

Dated: May 25, 2016
       Brooklyn, New York